The only point of importance, on which the Court decided, was, whether the maxim “in pari delicto potior est conditio defend-entis,” that is, “where both parties are equally guilty, the defendant shall prevail, ” applied in this case. (1)
In the opinions delivered by the Judges, the substance of the case is so fully stated, and the decree of the High Court of Chancery (from which this was an appeal) so accurately given, that it would unnecessarily increase the size of the volume to make any other statement here.
The arguments of counsel, (Randolph, for the appellant, and Warden, Duval, and Wickham, for the appellee,) having turned very much on the evidence, and the authorities cited by them, having been fully discussed by the Judges, we conceive that the insertion of those arguments would be productive of needless repetitions, and therefore omit them.
On Monday, October 27, the Judges delivered their opinions.
JUDGE TUCKER.
This case, as stated in the bill, and as it appears from the evidence, appears to be, in substance, this:
William Winston, being bound to Chapman Austin, in a twelve months’ replevy bond, for 1981. 6s.. of which about 381. had been discharged, when the bond became due, was applied to by„ Austin for the balance ; but not being able to pay it, asked for some further indulgence, as he proposed selling some lands for the purpose of discharging all his debts; or, if he could not 'sell his lands, he would sell a part of his negroes, and discharge his debt to Austin. Austin observed, that, if he sold his lands for cash, they would not sell for near their value; therefore, he had better sell his *27 negroes at once; for, if he did not sell them, they would be sold very shortly to discharge the debts of his brother, Geddis Winston, whose security he was, as high sheriff, and in other instances; and that ::'he also knew his brother had sold and made over all his property to his children, and was worth nothing— and that it was his advice to keep his land, as it was not liable for debt, and sell a part of his negroes to discharge his just debts, and make the rest over to his children, as his brother had done: — and finally proposed that bis negroes should be sold under an execution for his debt, in lots, so that they might sell for little or nothing, and get some person to buy them in for him: and that he, if Winston thought proper, would become the purchaser, and would make the negroes over to his children, as soon as Winston should pay him his debt, with interest. To this overture Winston lent a willing ear, and assented to it. It was then agreed that Winston and his family should not let it be known that Austin was to purchase in the negroes for him; but to tell every person that should make inquiry, that his negroes would certainly be sold: that Winston, on the day of sale, should proclaim to the people that the sale was a fair one, and, after the sale was over, he must apply to Austin to lend him the negroes to finish his crop, to keep the people at large from thinking he bought in the negroes for him. To all which Winston agreed, and directed his wife (the plaintiff in the suit below) and his son TJdward, from whose deposition this statement is made, not to tell any person of their plan; which, as far as it depended on Winston, was carried into execution at the sale, with the most scrupulous exactness : with this additional circumstance, that both he and Geddis Winston, on the same day, as it would seem, that this plan was adopted, wrote to the clerk of the Court to issue the execution upon Austin’s judgment, which had now become final. This execution, it must be remembered, was irrepleviable, being upon a judgment on a replevin bond. The several depositions of Starke, the sheriff, Obadiab Faucett, Samuel Cross, and Richard Ijittle-page, are In direct confirmation of EJdward Winston’s; and iirove unequivocally that Winston most heartily co-operated with Austin in the proposed plan.
The sum and substance of this plan, or agreement, was to defraud the Commonwealth, and all the other creditors of Winston, except Austin, under the pretext that the sale was a bona fide sale, made by a public officer acting under the authority of the law, to satisfy a debt bona fide due from Winston to Austin. Seventeen negroes were thus sold in lots, to satisfy a debt manifestly short of 2001. upon the face of the execution, and actually reduced at 'xthe time to about 1601. only. The sale amounted to 2071. 15s. and was publicly made September 20th, 1789: and by an account stated between the parties, it appears that three of the negroes were actually sold and conveyed back to Winston by Austin, for the same price he gave; and that the rest remained for a time in Winston’s possession, under a pretence of hiring them till Christmas, to finish his crop. But before that period, Winston died: and Austin, having got the negroes, or some of them, into his possession, and sold a part of them, this bill was brought by the executors of Winston to redeem them, and to have those which are more than sufficient to pay the debt and interest returned, with an account of their profits, or their valttes, if the slaves themselves cannot be had. The Chancellor decreed accordingly — and a balance of 1,1091. 5s. 8d. being found against Austin’s estate by the commissioner’s report, that report was confirmed: —the bill, as to the purchasers of the slaves from Austin, was dismissed.
I deem it unnecessary, at present, to enter any further into the particulars of this case, as my opinion will be founded upon this statement. If, however, that opinion should be overruled, it may be necessary to say something further.
I have said that the sum and substance of the agreement between the parlies was to defraud Winston’s creditors of their just debts. Austin, it is true, proposed the fraud: but Winston, without whose concurrence Austin’s fraud could never have taken effect, and whose creditors (and not Austin’s) were to be defrauded by the contrivance, lent a willing ear and a ready co-operation to it. He, therefore, in point of moral guilt, was most culpable; for there was a moral obligation on him to pay his just debts: — there was no such moral obligation upon Austin to pay, though the obligation not to defraud was equally strong upon him as upon Winston. Austin, mean time, appears to have been a bona, fide creditor of Winston’s. From the moment that his judgment was consummate, he had a legal lien on his lands also. The defendant could not replevy the slaves: they were, after the execution issued, in the custody of the law, and must have been sold, even for a tenth part of their value. Austin had a legal right to bid for the slaves, and, the moment they were struck out to him, {he title was absolutely in him, as against, Winston, both at law and equity; and, even against Winston’s creditors, to the full amount of his own debt. ’x’The case is stronger in Austin’s favour, upon these grounds, than any private conveyance from Winston could have made it: for what is done under the direction and authority of the law is more obligatory than any act of a party alone.
Now, an absolute deed between the parties, made with intent to defraud the creditors of the grantor, would be binding between the parties themselves, though merely void as to creditors, by our statute of frauds and perjuries, (a) Consequently, this sale, made under the authority of the law, to satisfy a just debt, is equally binding between the parties, whatever may be the effect of the collusive agreement between them as to creditors.
It is a maxim at law, that where the parties are equally culpable, or criminal, the defendant must prevail; and in equity, that he that hath done iniquity shall not have *28 ■equity; that is, he shall not have the aid of the Court when he is plaintiff: which brings both maxims to the same point. And the maxim of the civil law, as cited 1 Fonb. 233, (Pacta quas contra leges et con-stitutiones, vel contra bonos mores sunt nullam vim habere indubitati Juris ,est. Dig. L. 2, T. 3, 1. 6) — The cases both at law and equity, in support of this rule, are numerous, and are referred to, Francis’ Max. 2; 1 Fonb. 138 and 223 — 230. The case of Small v. Brackley, (a) which was a bill brought by a bankrupt to be relieved against a bond given to a particular creditor, who refused to sign and accept a composition for her debt, to be paid as other creditors, unless the plaintiff would pay her 1001. down, and three shillings in the pound over and above the composition, was finally dismissed by the Lord Chancellor, though a decree in his favour at the Rolls. Parsons v. Thompson,(b) and Garforth v. Hearon,(c) are both decisions upon the same principle; viz. that any agreement which is contrary to the true policy of law, shall not have the aid of a Court to enforce it at law. The case of Sir Arthur Ingram, cited Co. Litt. 234 a, seems to have furnished the rule in the latter: and it is there said, (H. Bl. 331,) that Courts of Fquity, in- setting aside securities supposed to be valid at law, have gone by the same rule, as in the case of Juxon v. Morris, those cited from Lord Nottingham’s notes, (and said to be mis-reported, 2 Ch. Cases, 42,) and in Law v. Law.(d) Cockshott v. Bennettl,(e) was a decision at law, founded on the principle of law against the creditors of the party making the promissory note upon which the suit was brought, (f) *The case of Trueman v. Fenton, (g) may be thought an authority against the course of these decisions. In that case a bankrupt, after a commission of bankruptcy sued out, in consideration of a debt due before the bankruptcy, gave a note to his creditor for a part of his debt: and the Court held, the creditor was entitled to recover; for the creditor did not prove his debt under the commission, but gave up two notes not yet due to the bankrupt, and took a note from the bankrupt, payable at a future day, for about half the sum: Here was no fraud upon the creditors, for this creditor never did, nor, after accepting the security, in lieu of the two notes delivered up to be cancelled, ever could prove a debt against the bankrupt before his bankruptcy. The case of Walker v. Perkins, (h) was upon a bond in consideration of the parties’ having agreed to live together. And Mr. Blackstone, th,en at the bar, argued for the plaintiff, that the setting aside such bonds was as much an encouragement to seduction in one sex, as establishing them would be in the other: and the same argument may be applied to the case before us. The Court, in the easel have cited, decided, however, in favour of the defendant; and my impressions concur with that decision; which corresponds with Lord Hardwicke’s in Robinson v. Gee,(i) Priest v. Parrot, (k) and, in a much harder case, 3 P. Wms. 339. (l) Cases to the same effect may be multiplied much farther: on the other hand, I am well aware, that others may be produced, where the doctrine contended for by Mr. Blackstone, in the case of Walker v. Perkins, above mentioned, has prevailed: but I incline to the contrary opinion, as thinking that all contracts founded on motives or considerations against the policy of the common law, or against the provisions of a statute, or against the policy of justice, or the rules and claims of decency, or the dictates of morality, are void both in law and equity, and ought not to have the aid of a Court to carry' them into effect. A combination between a debtor and a particular creditor, to defeat all the other creditors of the debtor of their executions against his estate, is one of great moral turpitude, more especially on the part of the debtor, although the project may have been proposed on the part of the creditor. For the debtor is bound to do an act towards his creditors; — that is, to pay them their just debts, and this, in foro conscientiae, he is bound to do punctually, and without delay. There is no such obligation on the part of any other than the *debtor: a contrivance to defraud-on the part of the debtor, acquires, as I conceive, an additional degree of moral turpitude, from this previous obligation to pay, superadding to the neglect of a moral duty, the commission of a moral injury. But, without pretending to balance the guilt of the parties against each other’s, both appear to me so culpable, that, had Austin been the plaintiff, and Winston the defendant, I should have held him as little entitled to the aid of a Court as I now think Winston.
But, it may be said, that Austin’s situation as a creditor, with an execution in nis pocket, gave him a controul over Winston, which might have its influence: the law admits no such excuse for injuries to a third person. Had Austin proposed an usurious contract, the argument would have applied; because a party assenting to an usurious contract, merely to gain further indulgence, is supposed to injure nobody but himself. But one assenting to a proposal to rob another, either on the highway, or by any collusive agreement with the party proposing, has, I apprehend, no such excuse in his favour, either at law or in equity. Besides, there is no evidence of threats or importunity.
But, to give a colour to the case, the bill suggests that Winston’s creditors will be injured, unless relief is given. But Winston’s creditors are not parties to the bill. If they' had been, I should have thought them entitled to relief. And, if this bill be dismissed, I should hold them still entitled to it.
For these reasons, I am of opinion, that the Chancellor ought to have dismissed the bill. But, as the Court is probably divided *29 upon this point, I shall proceed to consider what relief the Chancellor ought to have given; (since, by a division of the Court upon this point, the decree, so far as giving some relief, must be affirmed) ; and, even admitting Winston entitled to relief, the measure of it in the decree far exceeds any estimate in my mind.
Austin, by his execution, had a legal lien on all Winston’s negroes. If less than all would not sell for enough to pay it off, all must have been sold, without reserve. If a part only would have been sufficient, it was Winston’s fault, no less than Austin’s, that more than would have been sufficient were exposed to sale; and volenti non fit injuria. The most that Winston can claim, I apprehend, is the excess of the value of the slaves, as they might have sold, if the sale had been perfectly fair, above the sum due upon Austin’s execution. Having assisted in preventing *thc slaves from selling for their full value, or raiher, being, as far as I can discover, the sole agent who prevented others from bidding, he ought, so far, to take the consequences of his own folly, or depravity. Subsequent purchasers from Austin, who was notoriously the highest bidder at a public sale, and confessedly, on the part of Winston, a fair purchaser, ought not to be effected by any secret agreement between them ; even, if that agreement had not been fraudulent, as it undoubtedly was in its foundation. The executors of Winston are no more entitled to favour, than the executors of Austin; perhaps less, as one of Winston’s executors appears to have been present at the original agreement between Austin and Winston: but I lay no stress upon this, at present.
I am, therefore, of opinion, that the utmost that the complainant is entitled to, is the difference cf the value of the slaves, which actually came to the bands of Austin, and were afterwards sold by him to the other defendants, or were retained by him, as the slaves would have sold at public auction on the day of the sale, for cash, and the prices for which those slaves sold, after deducting therefrom the full amount of Austin’s just debt, with legal interest on the balance, if any, until paid; that the value of the slaves as they would then have sold, upon those terms, be ascertained by a jury, and that the depositions taken in this cause, so far as the same relate to the value of slaves at that time, may be given in evidence bjr either party, in case of the death or absence of the witnesses by whom those depositions were made, but no farther; and that an account of the amount of Austin’s debt on the day of sale be taken, a,nd the balance adjusted upon those principles; and that so much of the decree as dismisses the bill as to the other defendants, except Austin’s administratrix, be affirmed.
JUDGE) ROANE).
This is a bill brought by the appellees, executors of William Winston, deceased, against the appellant, ad-ministratrix of Chapman Austin, deceased, praying execution of an agreement, whereby, it is alleged, that Austin bound himself to Winston, to permit him to redeem certain slaves of his, sold under an execution of Austin’s, and purchased by him. The ground taken by the appellant in his statement is, not that Winston is barred from making the demand, by reason of the turpitude of his conduct, but that Austin made no such agreement, and committed no fraud against Winston, but acquired a bona fade title thereto, under the sheriff’s sale. It is clear, *from a. full consideration of the testimony, that such an agreement on the part of Austin is proved, and that he delivered possession of the negroes, after the sale, to Winston ; but afterwards repossessed himself thereof by various pretences, and by force and violence. It is also clear, that, if, in this transaction, Winston was guilty of no fraud to Austin or others, or, (in case he did commit a fraud,) it that fraud was neutralized and palliated by the hardship or peculiarity of his situation, there is then nothing to impede the specific execution of the agreement. It is alleged, but not shewn, that there were creditors of Winston who may be affected by the transaction in question: but this cause is now to be decided between the parties to that transaction only, and nothing now done can bar the rights of the creditors, if any, to oversale it hereafter, if they think proper to do so. In order to shorten this discussion, I will readily admit, that the conduct of both the parties to the transaction tended to set up a fraud against other creditors, if there were any; and the real question is, whether a proper apology for such fraud exists on the part of Winston, arising from the circumstances in which he then stood.
A great mass of testimony exists in the cause, all of which I have duly considered, but none of which I shall particularly repeat, as I am governed very much, in this case, b3r general principles: but the case, as it respects the question before us, is briefly this: That Winston, indebted to Austin on a replevy bond for , had no other thought or intention but that of selling his land and paying the debt; that Austin applied to him for payment; first advised him to sell his negroes, rather than his land, alarmed him with the danger of being reduced to beggary by his own, and Geddis Winston’s debts, and, putting on the guise of a friend, proposed to him the plan which is detailed in the testimony; and that Winston, confiding in him, dreading the impending danger, and seeing no other mean of relief than this, even against Austin’s own execution, readily clutched the jjroposal, acted his part in the furtherance of it, and his negroes were sacrificed at the sale, unless Austin be now held to his agreement.
The great principles, on which this question is now to be decided, are common to those cases in which oppression and imposition are expressly guarded against by statute, in aid of the general principles of law and equity, (such as the case of usury and the like,) and such cases wherein no statutory provision has been made. The selection *of a description of cases, which are of crying enormity, and demand the powerful interposition of the Legislature to aid the general principles of law, does not abandon other cases stand *30 ing on the same ground, but which, perhaps, do not require any statutory aid. The selection of usury, for example, does not surrender that protection which the law has ever afforded to debtors, against the influence and power of their creditors, to young heirs against those who seek to devour them, to wards against their guardians, and to various other descriptions of persons standing on a similar ground, and whose imbecility in such a contest has always received the protection of Courts of justice, (a) All these cases proceed on this ground, that, for a contract- to be binding, the parties must be free, and that no man can be considered as particeps criminis in a transaction, unless he entered into it freely ;(b) and it is a general principle, that the doctrine in favour of young heirs is extended to all persons, the pressure of whose wants may be considered as obstructing the exercise of their judgment, (c) Gentlemen may be as loud as they please in denouncing fraud, but there can be no fraud, which merits the utter reprobation of a Court of Equity, unless (if it is not supererogation to say so) it be entered into freely, and mala fide. The general doctrines to be found on this subject in Eonblanque and other books, in which relief is reprobated by á Court of Equity, ar; confined to cases in which a voluntary fraud has been perpetrated, and in which no apology is to be found in the oppression and distress of the party’s circumstances. Even in that event, relief is only granted to the distressed party: the volunteer in the fraud is forever bound thereby. I say the general doctrines to be found on this subject; — but there are special cases, which merit a more particular examination. Many of the cases upon this subject relate to frauds on marriage agreements, which have nothing to do with this question; not only because they are frauds on marriage treaties, which have produced an indissoluble union of the parties, and therefore must forever bind, or the wife and family be irreparably injured ; but are also voluntary frauds, committed under no pressure. These agreements in fraud of marriage, we are told, (2 P. Wms. 619,) (d) must bind, on the ground that you cannot put the wife in statu quo, or unmarry the parties; and marriage' is so much favoured in equity, that *we are told, (3 P. Wms. 66, )(e) that it is a case, and perhaps the'only case, in equity, in which a particeps criminis is permitted to avoid his own acts; so highly favoured is the consideration of marriage.
Most of the other cases put by the Judge who preceded me, (if not all of them,) are susceptible of answers which do not impugn the great principle I contend for. In the case of Small v. Brackly, (f) ■ decided in 1706, (and I beg that the answer I offer to it may be extended to other cases of a similar nature) it was decided that the plaintiff, (who had committed a great fraud against the defendant in the first instance, and then became bankrupt, after which he paid 1001. and gave a bond for 751. to his injured creditor to enter into a composition with his other creditors for his relief,) should not be relieved as to the said money and bond, although it was in fraud of the other creditors. The Chancellor, in giving his decree, laid stress upon his original fraud and breach of trust ;■ — but at this day, the grounds of that decision would certainly be exploded, (I mean independently of the original breach of trust:) at that time, the case -of Tomkins v. Bernet (g) was held to be law, on the ground of volenti non fit in-juria, and money paid on an usurious contract, could not have begn recovered back, in an action for money had and received. But at this day, the case of Tomkins v. Bernet is utterly exploded ;(h) the payer of the money is not held to be a particeps criminis, on account of the duress of his situation, and the contract as to him is cleansed of its impurity. A case on this subject, to be in point, should shew, that relief cannot be obtained in equity, since a recovery has been legalized in Courts of Law; but, in truth, the principle of that decision has been since overruled, in the cases of Bosanquet v. Dashwood, (i) and others — holding, that money paid by coercion may be recovered back in equity, as ■well as at law; and that equity will even go beyond the law in affording relief in such cases.(k)
The doctrine I subscribe to, therefore, is this, that in cases of equal frauds committed against third persons, (I mean where the parties thereto are equally guilty,) although such frauds operate no injury to the rights of such third persons, and create no rights in favour of the parties thereto, yet in that case possession stands for the right; and that one volunteer in such fraud, ma3r, as against his equally guilty companion, retain any advantage he has gained. He may not only, as against him, retain money thus iniquitously ^acquired, but retain, in absolute right, property which would otherwise be liable to redemption : — but, in both cases, right is out of the question, and if the turpitude of his adversary is annihilated or done away, his possession or his advantage cannot avail him. He does not stand on any merit of his own, but merely on the ground of the^ incompetencj' of his adversary to be received or countenanced in a Court of justice, to set up a scandalous pretension, in which he is equally particeps criminis with himself: —but whensoever the criminality of his adversary is held not to exist, and the transaction, as to him, ceases to be scandalous, equity does not refuse to hearken to his pretensions.
In the cases I shall presently put, as arising under the statute of usury, the statute of bankruptcy in England, and even the common law case of money paid by a debtor to his creditor beyond the principal and interest, in all which cases, money paid under duress, and in fraud of other creditors, was *31 recovered back in an action for money had and received, that recovery was only sustained, on the ground, that, in fact, no fraud was meditated by the persons paying the money, or rather that the fraud was purged, and the conduct of the parties purified, by reason of the duress of their situation. On no other ground than this, could that action have been sustained; an action which only lies where the plaintiff ex asquo et bono, (which implies innocence of fraud,) ought to recover, and which has been aptly compared (as to this point) to a bill in •equity. If, in the actual case before us, the appellee had (in addition) paid to the appellant a sum of money, as a consideration for his accomplishing the transaction in question, would it not be an enormity, that while the advantage gained by the appellant by the possession of the money should not avail him against the effect of an action for money had and received, and the appellee was acquitted, by reason of his situation of all fraud in relation to the transaction, (without which the action at law could not be sustained,) that the adverse party', for whom no such apology exists, should, in another forum, expressly instituted to relieve against frauds, and execute agreements, retain the advantage he has gained, discharged of its condition, and pocket the fruits of his iniquity?
But it is said, or may be said, that this creditor was not a perfect Shylock to his debtor, that the fatal scales were not yet uncased, nor the hapless victim yet pinioned for the operation. If it were necessary, (but it is not,) *1 might be almost justified in taking the affirmative of this picture in relation to the creditor; and the creditor himself has almost admitted the affirmative also, in relation to the debtor. Deplorable indeed was his case depicted to be by the appellant; — and it is a good general rule, that (between the parties) things shall be taken to be, as they are represented to be. But all this has; nothing to do with the question. I go upon general principles; but at the same time do not admit, that the facts of the case before us weaken the force of those principles in relation Lo it. II is not necessary, and has never been so decided, that the oppressed man or the debtor must be driven to the wall, and have no other possible refuge but in the proposal suggested to him by his creditor, or other person standing in a relation to him which implies an undue influence. In all the cases of relief against usurers, offenders against the bankrupt laws, guardians getting advantage of their wards, counsel of their clients, gaolers of their debtors, monied men and usurers entrapping y'ouiig heirs, &c. &c. as well as in the case of debtors, the law goes upon general principles, and takes it for granted, that persons in those situations are peculiarly liable to imposition. It enters into no minute examination of the artifices of those entrapping on the one hand, nor on the other hand, whether the person entrapped might not have subsisted yet a little longer, without submitting to the meditated imposition. It goes on the ground of mala tides on the one hand, and the necessity of preventing imposition on the other. It goes upon the general ground of preventing iniquity and extortion.
I will not deny but that Courts of Riquity might, in flagrant cases, go into such an inquiry; but the proofs in the case before us do not make it necessary to depart from the general principle, in this instance. — ■ The black series ox rigour, injustice, fraud, violence and oppression, of which this record clearly convicts the interstate of the appellant, on the one hand, shews whether he was not a creditor to be dreaded; and on the other hand, the dismay naturally resulting from executions on replevy bonds, in those days, when property is proved to have been sacrificed at sheriff’s sales, (to say nothing of Austin’s own strong and interested portrait on this subject,) enables us to judge whether Winston, assailed too by the cries and tears of his family, had not just cause of alarm and apprehension. Make the worst of this case, as it respects Winston, it clearly appears, that he was not ,K'only seduced by Austin, from his honest intention of selling his land and paying his debt, but that his purpose was not so much to defraud his creditors, as to escape from the execution of Austin, and shelter himself and family from destruction.
But it is said by the Judge who preceded me, that Winston was probably indebted ; that his conduct was a great violation of morality, in respect to his creditors; and that in point of morality, he was most culpable. The Winston violated the principles of morality, is already implied, by the admission that he had committed a fraud: but that fraud is palliated and excused by reason of the imbecility of his situation. But how does the case stand in relation to Austin? Who shall not be permitted, in a transaction of this kind, to hold up his face, either in a Court of Law or ISquily, unless his competitor be pari delicto with himself. To sav the least, he hatched and brought to maturity a free and voluntary fraud to the injury of Winston’s creditors: to say the truth, he capped the climax of his iniquity, by committing a double fraud towards his companion. So little regardful was he of the rules of morality, that he has not even observed a maxim sacred amongst thieves and felons, to be just and honest towards one another. It is with great reluctance, Sir, that I make these strong observations, but the truth of the case, and the ground I have taken on this occasion, demand it from me. It is necessary, in deciding whether the culpability of the parties is equal, to take a view of the conduct and situation of them both.
I will now avail myself of the mention of some common law decisions on this subject, in which the ground I have taken is, even in the law Courts, solemnly and ably supported. Some of these cases arise from the violation of statutes, made in aid of the general principles protecling persons from oppression, but one of them at least, (and many others might be found,) stands merely upon the common law principle. There is so great an analogy between this whole catalogue of cases, whether considered as in equity, at common law, or under the statutes, that I can make no discrimination *32 between them. Great principles are not to be shaken, by particular modifications and provisions, especially in a Court of Equity. I will premise that some of the old cases, and especially the leading case of Tomkins v. Bernett, are strongly and justly exploded in the cases I shall now mention. That leading case, as I have already said, denied the recovery *of money paid bo an usurer, beyond legal interest, in an action for money had and received: it was so decided too on the maxim, .(now strongly exploded, as applicable to that and similar cases,) volenti non fit injuria. The modern and exploding decisions will now run through, and affect all cases in which the party paying the money, is not free. The old cases (now exploded) produced, as I humbly conceive, the decision of Small v. Brackley, (already noticed,) and other cases of a similar nature: — and when, in addition to this, it is recollected that Courts of Equity have concurrent jurisdiction with Courts of Eaw, in decreeing a recovery of money under like circumstances; what prevents equity, which delights in decreeing contracts to be performed in specie, from doing so in a case like the present? But I must return to my subject.
In the cases now to be noticed, it is on all hands admitted as a general, perhaps as an universal proposition, that in pari de-licto potior est conditio defendentis: but in the application of this rule, some important distinctions have been solemnly and ably settled. It is said in them, that the prohibitions enacted by positive law, in respect of contracts, are of two kinds; 1st. To prevent weak or necessitous men from being overreached, defrauded or oppressed; and, 2d. Those prohibitions, which are founded on reasons of policy and public expedience. (Cowp. 200; Clarke v. Shee; Ibid. 702; Browning v. Morris, Doug. 670; Smith v. Bromley.)
Under the first class of cases, it is held, as has been airead}7 said, that money paid under an usurious contract, beyond legal interest, may be recovered back in an action for money had and received; and that money paid by a bankrupt, or even a friend of the bankrupt, in England, for his consent to sign -a certificate, (which is made illegal there by a particular statute,) may also be recovered back in a like action. The principle on which these decisions proceed, is, that there is not in those cases par delictum; for that the oppression and distress in which one of the parties stands, places him within the power of the other, and mitigates the culpability of his conduct. Those statutes are professedly made to prevent oppression; and the act of, a party arising only from his oppressed situation, and the severity of those under whose power he is placed, shall not bind him. and defeat the very end of the statute. It is not necessary for me to say any thing respecting the other class of _ cases, as they are not analogous to the case before us, but merely, that where a recovery is inhibited *in them, there is nothing in the circumstances or situation of the plaintiff, which exempts him from being considered as equally criminal with the defendant.
In the case now before us, there is no positive statute contravened, as has been often said, such as those alluded to in noticing the first class of cases before mentioned : hut the principles on which such statutes have been made, have been violated in the case before us. A debtor under a severe pressure of his circumstances, and under the influence and high coloured representations of his creditor, has consented to a proposal dictated to him by that creditor. Was the debtor free to refuse or accede to this proposition? He certainly was not. ■
But we need not rest this part of the case on general reasoning, and on the pointed analogy which exists between this case and those just noticed, arising under positive statutes: for in Bul. N. P. 132, it is held, “that if a person under the influence of his creditor, pay more than legal interest, he may recover it back, for he is under a moral tie to return it.” In that case, (as in this,) did not the debtor also commit a fraud upon his other creditors, if he had such, by paying to' the particular creditor an illegal sum, which should have been reserved for his general creditors? — In this case, (as in that,) is not Austin under a moral tie to comply with his agreement for redemption? An agreement, the violation of which will involve a double fraud, first upon Winston’s creditors, and then upon Winston himself 1
If, in the case just quoted from Buller, a recovery was had on general principles, our case is rendered much stronger, by the consideration that Austin, having an execution against Winston on a replevy bond, strongly depicted to him the desperateness of his situation, and pointed out to him the plan he proposed, as the only mean of saving his family from destruction. Was Winston, ignorant himself of the law, alarmed by the representations of Austin, and seeing, perhaps, no refuge from his then situation but in the adoption of Austin’s proposals, 'free to refuse that proposal? — Let the general principles which dictated the statutes before mentioned; let the feelings of all men placed in like circumstances; let that benignity of the law, which compassionates the infirmities and the distresses of men, answer the question.
But wherefore shall a specific performance of Austin’s agreement with Winston be not decreed? Does any one pretend to say that he (Austin) is entitled to any favour? *And admit, for a moment, that Winston, on his own merit, is not entitled to a specific execution of the agreement; shall we not consider the case of his other creditors? In decreeing for him, are we not also decreeing for them? By decreeing the negroes to Winston, unshackled by any conveyance of them to his children, (which was a part of the plan suggested by Austin,) they are immediately liable to the executions of his other creditors; whereas, by deciding in favour of Austin, those creditors can never come at them, without a tedious suit in Chancery against Austin, to annul the sale under which he acquired them. Whether, therefore, we consider the actual interests of Winston’s creditors, or wish to avoid a circuity of action, and multiplication of suits, we ought to decree a *33 performance of his conlraci against Austin, in the present case.
But it is said, that he who comes here for relief, must draw his justice from pure fountains. The same is said, and justly said, at law, in the action for money had and received, (a) But, in the law cases before put, the fountain from which the plaintiffs drew, was held to be purified by the duress and peculiarity of their situation. Such also, I apprehend, is the case before us. It is further said, that specific agreements are in the discretion of the Court, and will not be enforced but where all is just and fair. Agreed — but it would seem that supporting an action for money had and received, would give a good general rule on this subject; which action only lies, where ex ;equo et bono the plaintiff ought to recover.
Two circumstances were relied upon by the Court of King’s Bench, in the case of Smith v. Br.omley, which I will briefly remark upon, as strongly applying to the present case; and then dismiss this part of the subject. The fiist is, that the fraud there effectuated against the bankrupt laws, moved (as in this case) from the creditor to the party oppressed, or rather to his sister, who, from motives of affection, acted for her brother, and placed herself in his situation. The second circumstance is, that the action Was sustained, in that instance, in order to discourage frauds of that nature; for a discouragement to take money, on illegal considerations, would clearly be operated, by holding the takers liable to refund the money so illegally taken. So, in the present case, let us cut up by the roots, and discourage, enormities like the present, by making the chief actor in the fraud disgorge his iniquitous gains: let us not forget that men will generally xact right, when there is no temptation to the contrary. By dismissing the appel-
lee’s bill entirely, will you not ratify to Austin the entire fruits of his iniquity; and will not this effect be partially produced, in so far as you stop short of an actual restitution in specie, or an actual restoration of the value of the property, with interest?
With respect to the particular decree in question, I see no reason to alter it, or disturb it. If Winston is entitled to a specific execution of the agreement, he is entitled to the negroes themselves, (where they have not bona fide lawfully passed to other persons,) and to their profits. A trasteéis liable for the just value of the thing converted, and the cestui que trust is not to be bound by any injurious sales made by him. The decision of this Court in the case of Reynolds v. Waller, (b) comes fully up to this point.
As to the general table, by which the profits were settled in the present case, it is not shewn (if pretended) that it has wrought any injury. With respect to the vendees of the slaves, it is unnecessary to decide whether the Court has power to affect their interests, or, in other words, whether they may be considered as now béfore us; for, on the merits of the case, it is clearly shewn, that they purchased bona fide, without notice, and for a valuable consideration. Austin himself has taken this ground in his answer; and as he has done the same in relation to Campbell, it does not now lie in his mouth to object that Campbell is not made a party. He has taken the ground in his answer, that Campbell’s right to the negroes can never be impeached by Winston, and ought now to submit to a decree predicated upon that admission. That admission is competent to bind Austin, and may be closed with by the other party, (as is done in the present case,) but would not have prevented Winston from contesting the same, and going for the identical negroes, had he thought proper. Nothing is more common or right than to drop parties to a suit, when in the progress thereof it seems consented to on both sides, that such parties are unnecessary. The delays and difficulties incident 1o suits in JSquity, are great enough already'. In the case of Paulet v. The Bishop of Lincoln, (c) it is held that a plaintiff may, at the hearing, waive the relief he prays against a particular person, and that then the objection that he is no party will have no weight. So in this case, the plaintiff, before the hearing, suffered the suit to abate as to *Campbell, confiding in, and closing with Austin’s statement of the sale made to him, and waiving his claim to go for the identical negro against the representatives of Campbell.
I have thus endeavoured to explain the grounds and reasons of my opinion. On the great question whether relief shall be granted, I am happy to find that the concurrence of one other Judge on this point will secure some relief to the appellees. As to the measure oí that relief, I regret that I cannot entirely accord in the project proposed for a decree, great as my respect is for the quarter from whence it came. I can not readily see that any other decree than one for the identical negroes, or their just values, with interest and profits, will cither accord with justice, with previous decisions by this Court, (Waller v. Reynolds, and others,) or with the principle of preventing the appellant from enjoying the fruits of his iniquity. I cannot readily see, that when it is admitted, that an action at law, or in equity, would lie, for recovering back money paid for the furtherance or accomplishment of a contract like the present, thereby disaffirming the turpitude of the plaintiff, and admitting the iniquity of the transaction, as it relates to the defendant, the Court will not go on, and, pursuing the same principles, disrobe the transaction (as between these parties) of its iniquity, by holding the defendant to the stipulated condition of redemption. I cannot well see that the appellee should be held, in the present case, to a valuation commensurate with the probable product of sheriffs’ sales in those days, when it is in proof that he had intended to sell liis land rather than his negroes, before the intromission of the appellant with bis plan of seduction, and might have done so, with perhaps less loss than would have arisen from a sheriff’s sale of his negroes, as appears by the testi *34 mony. In event too, for every thing depends upon the opinion of the Jury, the appellant himself may be actually placed in a worse situation than if he were decreed to a specific performance.
Yet after all, I am not so sanguine on this point as on the other. I am not prepared to say that the sustentation of an action for money had and received, affords an universal rule for decreeing a specific performance. I well know that the exercise of this power depends much upon circumstances, and the discretion of the Court. In a case, therefore, depending upon a mass of facts and testimony, . I will not obstinately contend against the opinions of the other Judges, that an actual specific performance, and nothing else, ought to be *decreed. I will, therefore, concur in the extent of the relief proposed, (after having declared my sentiments on both points,) and thus afford some, though I think an inadequate relief to the appellees. I will on these grounds, and on these only, assent to the decree which has been agreed upon in conference, as the result of mutual concession and compromise.
JUDGE CARRINGTON.
There is no rule in law or equity that may not be varied in cases attended with peculiar circumstances, so as to come at the true justice of the case.
It is admitted that Austin and Winston entered into a base combination to defraud the creditors of Winston. But upon an accurate examination of the testimony and circumstances of the case, I think the latter is not altogether subject to the operation of a well-known maxim in equity, “That he who hath done iniquity shall not have equity;” or, in other words, shall not receive the countenance of a Court of Equity. I think, under all the circumstances, that the representatives of Winston are entitled to relief; but not to the extent of the decree of the High Court of Chancery.
I am for reversing that decree, and concur with the other Judges in a decree formed at our chambers now ready to be declared by the President. By this decree Austin will be punished for the fraud, by being bound to pay for the slaves in question the difference between the price for which he sold them and the reasonable value: on the other hand, Winston will be punished on his part, by being bound to take a reasonable price for slaves he wished to have kept; and thus, two innocent families may probably retain a subsistence.
But, so far as respects myself, it is not to be considered that any principle is here fixed so as to operate as a precedent in other cases. This decree is adopted to fit the present case only: and it is hoped that so gross a fraud may not again be brought before this Court.
JUDGE LYONS.
If a creditor extorts money from his debtor in distress,' on account of indulgence to him, <?r more than legal interest, it is illegal and oppressive to the debtor and his family; and, as no third person is injured or contemplated to be injured, or in any manner defrauded by it, there, and in such case only, the oppressed debtor or borrower, from whom money has been so illegally extorted, shall or may recover the money so extorted and paid beyond legal interest, by action at law or *bill in equity; as is said by Lord Mansfield, in Smith v. Brom-ley, cited in Jones v. Barkley, (a) But where the debtor colludes with the creditor, and meditates a fraud and deceit upon a third person, no party to the fraud, to deprive him of his just debt or claim, by selling at under value and conveying away an estate which would be subject to his debt, in order to protect it from execution, it is said to be so iniquitous that, if the debtor requires a nullity of the contract, such a demand, which is scandalous, ought not to be granted to him; as it is a maxim in equity that “he who hath committed iniquity shall not have equity,”(b) and Lord Mansfield, in the case of Montefiori v. Montefiori, (c) says, that no man shall set up his own iniquity as a defence, any more than as a cause of action, where a third person is affected by it. I was therefore, at first, strongly inclined to think that the fraudulent conduct of Winston in the present case excluded him from any claim for aid or relief in equity. But that being doubted by some of the judges, and there being a diversity of opinions respecting it, the rules before mentioned being thought by some too rigid to be adhered to in this case, under all its circumstances, as it might be supposed that Winston, who was a distressed debtor, was tempted and inveigled into the agreement, respecting the sale of his slaves at under value, by the persuasions and fair promises of Austin, who deceived him, (though why Austin should injure Winston without benefiting himself I cannot conceive, he having offered to sell to others most of the slaves at the same prices he bid for them,) I have concurred in the decree formed by the judges, which I am directed to report as follows:
The decree of the High Court of Chancery is reversed, and an issue is directed to be made up and tried before the Richmond District Court, to ascertain what the slaves taken and sold by the sheriff of Hanover, to satisfy Austin’s execution in the bill mentioned, (except such of them as were returned to the complainants, or have otherwise come to their possession,) would have sold for in ready money, on the day of the sale, if then fairly sold, without the interference or collusion of Austin and Winston, to bona fide purchaser or purchasers; on the trial of which issue, all the depositions taken in this cause relative to the sale and prices of the said slaves, if the witnesses be dead or absent, shall be admitted to be read as evidence *to the jury, together with any other legal evidence, by witnesses or otherwise, which either party may produce; and that Austin be charged with the prices of the slaves as found by the jury, and be credited for the amount of his debt, with interest at five per cent, to that day, and that the appellant out of the goods, &c. to be administered, pay the balance or overplus of the sales to the appellees, with interest from the day of sale and the costs in Chancery.

 See the cases of Clark v. Shee and Johnson, Cowp. 197, and Browning v. Morris, ibid. 790, also. Smith v. Bromley, cited in Jones v. Barkley, Doug. 696.-Note in Original Edition.

 I,. V. edit. 1794, c. 10, or Rev. Code. vol. 1, c. 10. p. 15.

 2 Vera. 603.

 1 H. Black. 332.

<c) Ibid. 327.

 3 P. Wms. 392.

 2 Terms Rep. 763.

 VideJackson v. Duchaire, 3 T R. 651, and Jackson v. Lomas, 4 T. R. 166.

 Cowp. 544.

 3 Burr. 1568,1 W. Black, Rep. 517, S. 0.

 1 Ves. 254.

 2 Ves. 160.

 Lady Cox’s case.

 See 3 Bac. Abr. Gwil. Edit. tit. Fraud, let. (B.) P. 298-306.

b) 1 Ponb. 218,1st ed.

 1 Fonb. 124, 1st ed. See also 1 Fonb. 229, 2 Fonb. 6, Phil. ed.

 North v. Ansell.

 Roberts and wife v. Roberts.

 2 Vern. 602.

 1 Salk. 22.

 See 2 Ponb. 6, note. Also 1 Ponb. 245, note.

 Cas. temp. Talbot, (or Forrester) 38.

 1 Ponb. 218, Dub. ed.

 Bul. N. P- 132.

 1 Wash. 164.

 2 Atk. 300.

 Doug-. 696.

 1 Fonb. 138.

 1 W. Black. Rep. 361.